IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| SAMUEL A. DUBYAK, | ) | No. C 06-0707 JSW (PR) |
| Petitioner, | ) | |
| | ) | **ORDER DENYING PETITION FOR A** |
| vs. | ) | **WRIT OF HABEAS CORPUS** |
| | ) | |
| A.P. KANE, Warden, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |
| _____ | ) | |

## INTRODUCTION

Petitioner, a prisoner of the State of California, has filed a habeas corpus petition pursuant to 28 U.S.C. § 2254 challenging the Board of Prison Terms ("BPT") denial of parole during parole suitability proceedings in 2003. This Court ordered Respondent to show cause why a writ should not issue. Respondent filed an answer, memorandum and exhibits in support thereof. Petitioner has filed a traverse. For the reasons stated below, the petition is denied on the merits.

## BACKGROUND

In 1987, in San Bernardino County Superior Court, Petitioner was convicted of first degree murder with the use of a firearm. The trial court sentenced him to a term of 25 years-to-life plus 2 years in state prison. Petitioner's minimum parole eligibility date on the life crime was August 31, 2004. In this habeas action, Petitioner does not

challenge his conviction or sentence, but instead alleges that his due process rights were violated by the denial of parole by the BPT during his first parole suitability hearing on September 2, 2003.

The BPT relied, in part, upon the following account of Petitioner's commitment offense from the Probation report:

> On August 27, 1984, Raul Rodriquez of Puerto Rico, contacted the Chino Police Department regarding the disappearance of Lourdes Dubyak. Investigation was turned over to Detective Beckman. Mr. Rodriquez advised Detective Beckman that no one had seen or heard from the victim since August 11, 1985. Mr. Rodriquez indicated that the victim kept in close contact with their family. In addition, Mr. Rodriquez indicated that if his sister left the area she would have taken her two-year-old daughter Angelica. Mr. Rodriquez also advised Detective Beckman that he had been in contact with the victim's husband, Samuel Dubyak, the defendant, and had received inconsistent statements from him. Mr. Rodriquez also advised the detective that he had called his sister at 9:00 pacific daylight time and had advised by the defendant that she was not home. According to the information received, a neighbor, the victim left her home between 8:15 and 8:30, and would have easily returned home prior to 9:00 p.m. telephone call. Mr. Rodriquez indicate that his sister and her husband had been having marital problems for a period of time, and the victim had spoken with him regarding divorcing her husband, the victim. Mr. Rodriquez further indicated that the victim had been having an affair with several individuals over the last several months, in fact defendant was aware upon receiving this information. The detective began his own investigation into the whereabouts of the victim. Officer Beckman was able to establish that on the weekend of August 9th through August 11th the victim spent the time with her lover. . .Berasaluce, in a motel together. The lover dropped the victim off at her residence on August 11, 1985 in the early afternoon. That was the last time he heard from her. They had made arrangements to have a lunch date on Tuesday, August the 13th, 1985. However, the victim failed to keep the engagement. The detective interviewed Debbie Alongis, a close friend and neighbor of the victim. She indicated that she had last seen the victim on August 11th, 1985 at approximately 8:00 p.m. The victim left her residence and was on her way home. That was the last she ever saw the victim.

> On August 30, 1985, the prisoner was interviewed by Detective Beckman. After being advised of his right, the defendant indicate[d] that she had made a telephone call, dropped of the – dropped the baby off in his room and said she had to go out for a while. The prisoner assumed that the victim had taken her car[]. However, on awakening in the morning he discovered that his wife had not left him in an automobile. As the investigation continued the detective learned that the Dubyak[]s slept in separate bedrooms, and that the bedroom in which Mrs. Dubyak slept in had been converted into a –had been converted to a television room. The double bed, which Mrs. Dubyak slept in apparently was gone. When the

detective questioned Mr. Dubyak regarding this he indicated that the victim must have taken it as she had – as he had no idea where the bed was. Investigation into the whereabouts of the victim continued. And through investigations, the detective learned that on[] August 16, 1985 the defendant and his brother Peter Dubyak, along with a 13-year-old juvenile from the neighborhood, had loaded a bed from the defendant's house into a truck and subsequently dumped in on the side of the road east of the Ontario International Airport. On November 5th, 1985 the bed was discovered approximately 200 yards east of Vineyard Street in Ontario. The bed was subsequently identified by family members and neighbors as the bed which was originally in the victim's bedroom. On November 6th, 1985, the mattress and bedsprings, and hard board was preliminary[sic] examined by the San Bernardino's Crime Laboratory Unit. Tests for traces of human blood was conducted with negative result. However, during the examination, two holes were observed to have been cut in the foam part of the mattress. A complete examination of the bed was completed on November 8th, 1985 at which time a projectile exit hole was located on the underside of the mattress. . . .The projectile hole was found in the box spring of the mattress, and a projectile later to be determined to be of a .22 caliber long rifle gold jacket bullet was found in the box spring. After presenting above information, the detective had obtained an arrest warrant for the prisoner and his brother[] for investigation of murder. Additionally, the detective obtained a search warrant. And on December 2nd, 1985, the warrant was executed. On that date a luminol regional test was conducted by the San Bernardino County Criminalist Laboratory. The test was made in an attempt to locate traces of blood in the residence. When the luminol region was applied to the bedroom in which the bed had been, traces of bloodstain was located on the wall near the headboard of the bed around the light switch and on the carpet itself. An additional blood stain was also located on the carpet, and of the hallway leading to the laundry room and garage. In addition, the presence of blood was located in the rear. . .hatchback of the vehicle belonging to the defendant. In addition, several rounds –several hundred rounds of Remington .22 caliber had been discovered in the residence. The Defendant was arrested on December 2nd, 1985. . .and he was subsequently released on December 4, 1985. At that point, investigation continued. During that time additional information was obtained – contained to indicate that the defendant was responsible for the disappearing and probable death of the victim. Check of the victim's charge card revealed no charges had been made during the time period, been no activity on the card of the victim on the joint checking account. During that time it was established that the defendant had reported to work on Monday, August 12, 1985. However, after being there approximately 45 minutes had left ill. The defendant subsequently returned to work the following day. . . .

[A]fter almost 13 months of investigation, the defendant was again arrested for the murder of the victim. And November 13, 1986 criminal information was filed in the West District Superior Court by Deputy District Attorney Robert Duizzino, accusing defendant of murder.

On February 26th, 1987, after deliberating less than six hours, a jury found the defendant guilty of murder first with an enhancement of a firearm also

1    found true.  On that day the matter was referred to the probationary
2    officers.

3    (Respondent's Exhibit 2 (hereinafter "Ex. 2 ") at 14-15.)

4    While Petitioner's counsel asserted that Petitioner had challenges to the facts as stated in

5    the probationary report, the panel stated, "because we don't have anything else we're

6    going to accept as true the statement of facts outlined in the probationary report.  (*Id.* at

7    33.)

8        The Board then read the prisoner's version from the Board report:

9        On March 9, 1987 the inmate was interviewed at the San Bernardino
10       County Jail.  Mr. Dubyak. . .indicated that on the advice of his attorney, he
         did not wish to discuss the matter with the undersigned officer.  He related
11       that he anticipated a conviction will be appealed.  He did state, however, to
         the undersigned officer, I'm innocent.  Mr. Dubyak was aware that he
12       would be sentenced to state prison on this matter, however, requested the
         court postpone his deliverance to the Department of Corrections until after.
13       . . the juvenile court [hearing] here regarding the dependency of his four-
         year-old daughter. . . .Mr. Dubyak stated that he had nothing more to add
14       or to change in his original statement.

15   (*Id.* at 34-35.)

16       At the hearing, Petitioner also testified about his criminal history, which involved

17   a juvenile arrest and no prior adult convictions.  (*Id.* at 36.)  Petitioner testified that he

18   completed high school, attended aviation school and eventually received a B.S. degree

19   from Embry Riddle during his incarceration.  (*Id.* at 36-37.)  Petitioner testified that he

20   grew up in an intact family, with a brother and a sister and he remains in contact with his

21   sister, who works in a school.  (*Id.* at 38-39.)  The BPT discussed Petitioner's work

22   history, which included working for computer companies and for Hughes and McDonald

23   Douglas Helicopter Corporation as a production control analyst.  (*Id.* at 39.)  The panel

24   reviewed information from the Federal Aviation Administration that Petitioner was

25   certified as a commercial pilot and Petitioner testified that he served in the military from

26   1960 to 1963 and he was honorably discharged as a lance corporal.  (*Id.* at 40.)

27       Petitioner testified that he was married twice, the first to Virginia Chacone

28

                                         4

Rodriquez and that he has five children, four of whom he remains in contact with.  (*Id.* at 40-41.)  Petitioner testified that he never used illegal drugs and that he did not have a history of alcohol abuse.  (*Id.* at 41-42.)   Petitioner testified that he was eligible for social security and that he planned to support himself on social security.  (*Id.* at 43.)

During the time he spent in prison, Petitioner did not complete any vocational programs.  (*Id.*)  Petitioner held various porter assignments over the years, for which he received satisfactory and above average grades, but he has been unassigned for significant periods of time due to his status as completely disabled.  (*Id.* at 43-44.)  However, Petitioner completed a "vocational tutor workshop, a 12 hour program back in 1993[.]"  (*Id.* at 46.)  He has not participated in any further self-help programs because he testified that he does not have any substance abuse issues and "I didn't see any purpose in any of those."  (*Id.* at 46-47.)  Petitioner testified that he didn't need anger management or job training because "I don't really have an anger management problem in my mind[,]" and he didn't require job training because "I have worked all of my life."  (*Id.* at 47.)  Petitioner had a "couple of lauditories" from 1998 for working on a children's holiday festival and from 1993 for helping illiterate inmates learn to read.  (*Id.*)  His disciplinary history includes one administrative violation for circumventing mail procedures in 1994 and one "128" for a physical altercation in 1999.  (*Id.* at 47-48.)

The BPT also considered Petitioner's prison counselor's report that stated that Petitioner poses a moderate degree of threat to the public if released on parole.  (*Id.* at 48.)  The counselor notes that during the interview, Petitioner implied that the victim was missing and could be alive somewhere and that Petitioner appears to be "in denial of the crime and he needs to come to terms with these issues."  (*Id.* at 48-49.)  The counselor notes that prior to release, Petitioner could benefit from participating in self-help and therapy.  (*Id.* at 49.)  In response, Petitioner testified that "I was never a threat.  I never fought.  There's nobody that can have a complaint against me for my actions[.]"  (*Id.* at

49.)  The BPT panel also considered a psychological report from June, 2003, where clinical psychologist Dr. J. Steward noted that Petitioner is not a danger to others in an institutional setting, but that it is not possible to predict his dangerousness because he did not discuss the details of his conviction.  (*Id.* at 50-51.)  Dr. Stewart went on to state:

> Inmate Dubyak is not a mass murderer.  It is unlikely he would recommit such an offense.  However, if he becomes involved in a trusting and intimate relationship in which he feels betrayed, [] there is the potential of him handling the disappointment in a similar manner.  However, one hopes with maturity he would not do so.  There is concern for his calculating and detached nature in which he conducted himself during the investigation.

 (*Id.* at 51.)  The Board noted the psychologist's recommendation that if Petitioner was released on parole, he needed to be engaged in anger management, in depth group psychotherapy and individual counseling.  (*Id.* at 52.)

The Board questioned Petitioner about his parole plans, which included plans to reside with his sister in California.  (*Id.* at 53.)  Petitioner stated that he had a job offer in Los Angeles County but that he didn't plan to move there, so he had no job offer.  (*Id.* at 59.)  Petitioner testified that he intended to support himself with social security and that he believed he would be eligible upon his release.  (*Id.* at 60-61.)  Petitioner provided some information from the Federal Aviation Administration about the ability to maintain his commercial pilot license, as well as letters of support from three members of the community.  (*Id.* at 61-63.)

The Deputy District Attorney from San Bernardino County opposed parole based on Petitioner's sophistication in planning and executing the crime, where Petitioner went so far as to mail a card from Mexico reportedly from the victim, which scientific evidence proved to have been traced from another letter a long time before the victim's death. (*Id.* at 66-67.)  The District Attorney also argued that Petitioner failed to do anything while incarcerated that would go beyond that which advances his self interest and that he failed to do anything to show that he has gained insight from which the Board can gauge his level of potential threat  (*Id.* at 68-69)  In his closing, Petitioner explained

that the "115" he received, occurred when he mailed some documents he helped another inmate prepare to a court and put his own name and prisoner number on the outside. (*Id.* at 74.) Petitioner explained that while he committed that act, he did not understand that to be in contravention of the mail rules at the prison, but rather the proper mailing procedure. (*Id.*)

After a recess to consider the evidence before it, the BPT found that Petitioner was not suitable for parole and would pose an unreasonable risk of danger to society and a threat to public safety if released from prison. (*Id.* at 77.) The presiding Commissioner explained that, in deciding to deny parole, the panel considered all of the information received from the public in denying parole. The Board found that Petitioner's commitment offense was carried out in an especially cruel and callous manner and was carried out in a dispassionate and calculated manner. (*Id.*) The BPT also found that the offense was carried out in a manner that "demonstrates an exceptionally callous disregard for another human being" and that the motive for the crime was inexplicable. (*Id.*)

Further, the Board found that Petitioner has programmed in a limited manner and has failed to upgrade vocationally while he was in prison. However, Petitioner's administrative appeal of the Board's decision which was partially granted resulted in a finding that this part of the decision should be deleted. (*See,* Answer, Exhibit 9 at 1.) The BPT also stated, "[a]nd most importantly, he failed to participate in significant self-help programs, anger management, those types of programs." (*Id.* at 78.) They noted that the most recent psychological report "is basically an inconclusive report[]" where the doctor notes that it's impossible to predict Petitioner's level of dangerousness. (*Id.*) The Board requested that a new evaluation be conducted before Petitioner's next hearing. (*Id.*) The Board also noted that Petitioner's parole plans were inadequate. (*Id.* at 79.)

The Board denied parole for a period of three years. (*Id.* at 80.) The BPT panel

relied on the same reasons for the denial.  (*Id.* at 82-83.)

Petitioner challenged the BPT's decision in San Bernardino County Superior Court, which issued a reasoned opinion denying Petitioner's claims.  The court found that there was "some evidence" to support the BPT's determination that Petitioner was unsuitable for parole because he is unpredictable and remains a threat to others.  (Respondent's Exhibit 11 at 3.)  The court found that the record supports the finding of the BPT based on the circumstances of the crime and that Petitioner's parole plans were insufficient and he needed to involve himself in some positive self-help programs.  (*Id.*)  The California Supreme Court summarily denied Petitioner's habeas petition on December 21, 2005.  Thereafter, Petitioner filed the instant federal petition for a writ of habeas corpus on January 31, 2006.

## DISCUSSION

A.   Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified under 28 U.S.C. § 2254, provides "the exclusive vehicle for a habeas petition by a state prisoner in custody pursuant to a state court judgment, even when the petitioner is not challenging his underlying state court conviction."  *White v. Lambert*, 370 F.3d 1002, 1009-10 (9th Cir. 2004).  Under AEDPA, this court may entertain a petition for habeas relief on behalf of a California state inmate "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

The writ may not be granted unless the state court's adjudication of any claim on the merits: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court

8

proceeding." *Id.* at § 2254(d).  Under this deferential standard, federal habeas relief will not be granted "simply because [this] court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." *Williams v. Taylor*, 529 U.S. 362, 411 (2000).

While circuit law may provide persuasive authority in determining whether the state court made an unreasonable application of Supreme Court precedent, the only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision.  *Id.* at 412; *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003).

B.   Legal Claims and Analysis

Petitioner claims that the BPT's denial of parole in 2003 violated his right to due process and equal protection.

1.   The BPT Decision

California's parole scheme provides that the BPT "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting."  Cal. Penal Code § 3041(b).  In making this determination, the BPT considers various factors, including the prisoner's social history, the commitment offense and prior criminal history, and his behavior before, during and after the crime.  *See* Cal. Code Regs. tit. 15, § 2402(b) – (d).

The record shows, and there is no dispute, that the BPT panel afforded Petitioner and his counsel an opportunity to speak and present their case at the hearing, gave them time to review Petitioner's central file, allowed them to present relevant documents and provided a reasoned decision denying parole. The panel concluded that Petitioner is not

suitable for parole and would pose an unreasonable risk of danger to society and a threat to public safety if released from prison.  The panel explained that it found the commitment offense was committed in an extremely calculated and dispassionate manner and found the motive for the crime to be inexplicable in comparison with the gravity of the offense. The panel further found that Petitioner's parole plans were insufficient and that, most importantly, he had failed to avail himself of sufficient self-help programming, such as anger management, while in prison.  (Ex. 2 at 78.)  The BPT noted that Petitioner had been an excellent prisoner in a controlled setting and requested that a new psychological examination be conducted that assesses Petitioner's potential for dangerousness upon release.  (*Id.*)  The BPT noted that Petitioner needs to involve himself in positive kinds of programs such as self-help, with an emphasis on anger management, anger control, the kind that will allow him to deal with stress in a non-destructive manner.  (*Id.* at 80).  The BPT noted that Petitioner remains "unpredictable and a threat to others" until further progress is made.  (*Id.*)   The Board commended Petitioner's progress but found that the positive factors did not outweigh the factors of unsuitability.  (*Id.*)  The San Bernardino County District Attorney also opposed parole.

           2.      The State Court Decisions

       The state superior court found that the BPT's denial of parole was supported by "some evidence" in the record.  (Exhibit 11 at 3.)  Specifically, the court cited the Board's findings with respect to the cruel and callous circumstances of the murder, Petitioner's insufficient participation in self-help programs, which it found to be supported by some evidence in the record.  (*Id.*)  The superior court further found that the BPT's determination that Petitioner remained unpredictable and a threat to others was supported by evidence  (*Id.* at 3.)  The court noted "[i]t is equally clear that the Board found. . .that the petitioner needs to involve himself in some positive kinds of self-help programs."  (*Id.*)  The California Supreme Court summarily denied Petitioner's habeas

10

petition.

3.      The Federal Right to Due Process

California's parole scheme "gives rise to a cognizable liberty interest in release on parole" which cannot be denied without adequate procedural due process protections. *Sass v. California Bd. of Prison Terms*, 461 F.3d 1123, 1128 (9th Cir. 2006); *McQuillion v. Duncan*, 306 F.3d 895, 902 (9th Cir. 2002). The determination does not depend on whether a parole release date has ever been set for the inmate because "[t]he liberty interest is created, not upon the grant of a parole date, but upon the incarceration of the inmate." *Biggs v. Terhune*, 334 F.3d 910, 914-15 (9th Cir. 2003).

Due process requires that "some evidence" support the parole board's decision finding him unsuitable for parole. *Sass*, 461 F.3d at 1125 (holding that the "some evidence" standard for disciplinary hearings outlined in *Superintendent v. Hill*, 472 U.S. 445, 454-55 (1985), applies to parole decisions in § 2254 habeas petition); *Biggs*, 334 F.3d at 915 (same); *McQuillion*, 306 F.2d at 904 (same). The "some evidence" standard is minimally stringent and ensures that "the record is not so devoid of evidence that the findings of [the BPT] were without support or otherwise arbitrary." *Hill*, 472 U.S. at 457. Determining whether this requirement is satisfied "does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence." *Id.* at 455-56 (quoted in *Sass*, 461 F.3d at 1128). Due process also requires that the evidence underlying the parole board's decision have some indicia of reliability. *Biggs*, 334 F.3d at 915; *McQuillion*, 306 F.3d at 904. In sum, if the parole board's determination of parole unsuitability is to satisfy due process, there must be some evidence, with some indicia of reliability, to support the decision. *Rosas v. Nielsen*, 428 F.3d 1229, 1232 (9th Cir. 2005).

When assessing whether a state parole board's suitability determination was supported by "some evidence," the court's analysis is framed by the statutes and

11

regulations governing parole suitability determinations in the relevant state. *Irons v. Carey*, 505 F.3d 846, 850 (9th Cir. 2007). Accordingly, in California, the court must look to California law to determine the findings that are necessary to deem a prisoner unsuitable for parole, and then must review the record in order to determine whether the state court decision holding that these findings were supported by "some evidence" constituted an unreasonable application of the "some evidence" principle articulated in *Hill*. *Id.; see id.* at 852-53 (finding state court did not unreasonably apply "some evidence" standard to uphold parole suitability denial where there was some evidence at the time of the hearing to support a finding that the prisoner would present a danger to society based on the nature of the commitment offense under the applicable parole regulations).

There was evidence before the BPT to indicate that Petitioner continued to pose an unreasonable risk of danger to society. To begin with, there is evidence to support the finding that the murder was carried out in an exceptionally cruel and callous manner in that it was carried out in a dispassionate and calculated manner. Further, there is support for the finding that the motive for the crime was inexplicable. Moreover, there is support in the record for the findings that Petitioner had not adequately participated in self-help programming and that his participation in these kinds of programs will enable him to face, discuss, understand and cope with stress in an non-destructive manner. While Petitioner takes issue with the BPT's determination that "he should have taken self help courses" and argues that he is "absolutely clean" of any indication that he needs such assistance. Petition at 2. However, the Court is not persuaded by Petitioner's argument. Th Court finds that the BPT's reliance on these factors, including the circumstances of the crime and Petitioner's failure to participate in such programming, constitutes "some evidence" to support the BPT's decision. Such evidence amounts to "some evidence" in support of the BPT's determination that Petitioner continued to present a risk of danger if

released to the public, and consequently that Petitioner was not suitable for parole.

The Ninth Circuit has noted that "over time" the BPT's "continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment" would "raise serious questions involving his liberty interest in parole." *Biggs*, 334 F.3d at 916.  However, in this case the BPT's denial of parole was not only based upon Petitioner's commitment offense.  Here, there were other supported reasons, described above, for their denial of parole as well.

Based upon the record in this case, the state courts' determination that there was some reliable evidence to support the BPT's decision, and that Petitioner's right to due process was not violated, was not contrary to or an unreasonable application of federal law.  *See, e.g., Rosas*, 428 F.3d at 1232-33 (upholding denial of parole based on gravity of offense and psychiatric reports); *Biggs*, 334 F.3d at 916 (upholding denial of parole based solely on gravity of offense and conduct prior to imprisonment); *Morales*, 16 F.3d at 1005 (upholding denial of parole based on criminal history, cruel nature of offense, and need for further psychiatric treatment).  Accordingly, habeas relief is not warranted on this claim.

Petitioner also argues that his rights were violated by the BPT's failure to set a term under the "matrix" of parole terms for prisoners who have been found suitable for parole.  Under state law, the matrices come into play only after a prisoner has been found suitable for parole, *see In re Dannenberg*, 34 Cal. 4th 1069, 1071 (Cal. 2005).  However, here, Petitioner was found unsuitable for parole, so he did not have a due process right created by state law to have the Board apply the matrix, and of course there is no such direct federal right.  This claim is without merit.  Petitioner's remaining arguments are unpersuasive.

## CONCLUSION

For the reasons set forth above, the petition for a writ of habeas corpus is DENIED.

1    The Clerk shall enter judgment in favor of Respondent and close the file.

2         IT IS SO ORDERED.

3    DATED:  March 11, 2009

4                                              _____
                                               JEFFREY S. WHITE
5                                              United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

14

1    UNITED STATES DISTRICT COURT

2    FOR THE

3    NORTHERN DISTRICT OF CALIFORNIA

4

5

6    SAMUEL A. DUBYAK,                        Case Number: CV06-00707 JSW

7              Plaintiff,              **CERTIFICATE OF SERVICE**

8        v.

9    KANE et al,

10             Defendant.
     _____/

11

12   I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District
     Court, Northern District of California.

13   That on March 11, 2009, I SERVED a true and correct copy(ies) of the attached, by placing said
     copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing
14   said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery
     receptacle located in the Clerk's office.

15

16

17   Samuel A. Dubyak
     D54700
18   California State Prison
     P.O. Box 689
19   Soledad, CA 93960

20   Dated: March 11, 2009

                              *Jennifer Ottolini*

21                            Richard W. Wieking, Clerk
                              By: Jennifer Ottolini, Deputy Clerk

22

23

24

25

26

27

28